HAROLD E. STAATS AND MARY H. STAATS, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Staats v. Commissioner
Docket Nos. 9799-80, 19029-81.
United States Tax Court
T.C. Memo 1983-176; 1983 Tax Ct. Memo LEXIS 611; 45 T.C.M. (CCH) 1152; T.C.M. (RIA) 83176; March 31, 1983. Barbara J. Rose, for the petitioners. Carmen J. Santamaria, for the respondent. FEATHERSTON
MEMORANDUM FINDINGS OF FACT AND OPINION FEATHERSTON, Judge: Respondent determined deficiencies in petitioners' *613 Federal income taxes as follows: Additions to Tax
Sec. 6651(a),
Sec. 6653(a),
Docket No.
Year
Deficiency
I.R.C. 1954
I.R.C. 1954
9799-80
1976
$11,281.00
$ 564
1977
$30,993.50
$1,638
19029-81
1978
$22,996.00
$2,300
$1,393
1979
$22,478.00
$1,123
The parties have agreed to the following maximum deficiencies should the Court rule that the Harold Staats Equity Trust has no validity for tax purposes: Additions to Tax
Sec. 6651(a),
Sec. 6653(a),
Year
Deficiency
I.R.C. 1954
I.R.C. 1954
1976
$ 7,022
$ 351
1977
$21,739
$1,175
1978
$ 9,962
$997
$ 741
1979
$16,546
$ 827
The issues to be decided are: 1. Whether petitioners are properly taxable on certain income earned by Harold E. Staats but transferred to the Harold Staats Equity Trust; 2. Whether certain income and expense items reported by the trust are properly attributable to petitioners either because of the grantor trust provisions, sections 671-677, [1] or because the trust was a sham, lacking in economic reality; and 3. Whether all or part of the underpayments of tax was due to petitioners' negligence *614 or intentional diregrd of the tax laws within the meaning of section 6653(a). [2]
FINDINGS OF FACT When they filed their petitions, petitioners were legal residents of Portland, Oregon. Petitioners Harold E. Staats (hereinafter Harold) and Mary H. Staats (Mary) are husband and wife. At all times in 1976 through 1979, Harold worked as an insurance agent with State Farm Insurance Companies (State Farm). As such, he was an independent contractor and not an employee. State Farm did not control Harold's daily activities. On June 3, 1976, Harold established the Harold Staats Equity Trust (the trust), using preprinted forms obtained from the Institute of Individual Religious Studies (IOIRS). In accordance with instructions provided by IOIRS, the blanks in the forms were filled in by Donna Paulson (Donna), one of Harold's employees in his insurance agency. *615 Donna has been employed by Harold for approximately 10 years and has been a friend of petitioners for approximately 15 years. In establishing the trust, Harold did not seek the advice of an attorney, certified public accountant, or public accountant. On June 3, 1976, Harold executed a "declaration of trust," the first in a number of documents designed to establish the trust. In this document he named himself, Mary, and Donna as trustees. The declaration granted the trustees broad powers, and provided that affirmative action could be taken upon vote of the majority of the trustees. Beneficial interests in the trust, described as "non-assessable, non-taxable, non-negotiable but transferable," were divided into 100 units, entitling their holder to "a pro rata share of any distribution of income distributed by the Trustees in their sole discretion, and to a pro rata share of the Trust corpus upon the termination of the Trust." The trust was to continue for 25 years unless the trustees "at their discretion" decided to terminate it earlier. On the following day, June 4, 1976, Mary transferred to Harold in trust her interests in real and personal property, including the exclusive *616 use of her lifetime services "[f]or the express purpose of facilitating the reconveyance of the hereinafore described property by Harold Staats Equity Trust to form the Corpus thereof." The property so conveyed included Mary's interest in petitioners' residence and its furnishings (e.g., chairs, living room drapes, a set of silverware, a can opener, two toothbrushes) as well as certain stocks, bonds, and bank accounts. Mary also executed quitclaim deeds in favor of Harold on certain income-producing rental property owned by petitioners. According to the minutes of the first meeting of the trustees held June 4, 1976, Harold, by affidavit dated June 5, 1976, transferred to the trust his interests in the same properties, as well as the right to his lifetime services and accruing remuneration. He also executed quitclaim deeds in favor of the trustees on the same rental properties that Mary had quitclaimed to him the day before. In addition, Harold leased to the trust petitioners' personal car. These transfers purportedly shifted to the trust virtually all the property owned by petitioners. Also on June 5, 1976, Harold was appointed executive trustee of the trust and, as such, *617 was to manage the trust's day-to-day business affairs. Mary was appointed executive secretary. As managers, petitioners were required to live in the trust headquarters, i.e., the family residence. Their managerial relationship with the trust was embodied in an "employment agreement" by which the trust agreed to pay certain expenses (including petitioners' health care) and fees as set by the trustees.
Also dated June 5, 1976 are "bank resolution minutes" which designated two banks as depositories of the trust's funds.The checks for these accounts bear the printed names "Harold Staats Equity Trust," or "Harold E. Staats Insurance Agency." The bank was authorized to pay out funds for checks signed by the trustees; the trustees were authorized to borrow money from the bank on the trust's behalf only upon ratification of a majority of the trustees. In "consideration" of Harold's transfers, he received all 100 units of the trust's beneficial interests. The "benefits" conveyed by these units "consist solely of the emoluments as distributed by the action of The Trustees and nothing more." After a series of transfers on June 5, 1976, the units were redistributed as follows: Mary--50 *618 units; Harold--15 units; Donna--20 units; Ronald Staats--15 units. The units were further redistributed on or about June 1, 1977, so that Harold owned 5 units and Ronald 25. Also on June 1, 1977, harold resigned as trustee.
Harold wrote the vast majority of the checks drawn on the trust's two bank accounts during the years in issue. At various times, Harold issued checks from the trust's accounts for personal purposes (e.g., to pay individual income taxes, attorneys' fees, and traffic tickets, and to purchase flowers, milk, and shoes). After Harold resigned as trustee in June 1977, he continued to sign checks on the trust's two accounts at least through the end of 1979. The 1976 income tax returns for petitioners individually and for the trust were prepared by Dana White, a tax consultant licensed by the State of Oregon. Mr. White refused to prepare any returns for petitioners in later years because of the Internal Revenue Service's position that such trusts did not shift the incidence of taxation. He informed Harold of this position. [3]
*619 OPINION Petitioners have set up a family trust to which they purportedly conveyed their interests in substantially all of their property and by which they attempt to reduce their tax liabilities. Respondent argues that petitioners' purported conveyance to the trust of their lifetime services and remuneration therefrom constitutes an impermissible anticipatory assignment of income; that petitioners should be treated as the owners of the trust under the grantor trust provisions, sections 671 through 677; and that the trust is not entitled to recognition as an entity separate and distinct from petitioners. We agree with respondent's first and third arguments and need not address his second. It is clear that petitioners' assignment of their lifetime services is ineffective to shift the incidence of taxation from them to the trust. As the Court of Appeals for the Seventh Circuit recently stated in , affg. a Memorandum Opinion of this Court: "Since the seminal case of , * * * it has been clear that income is taxed to the person who earns it, regardless of what arrangements *620 he makes to divert the payment of it elsewhere." The critical question is who controls the earning of the income. .
Petitioners presented no evidence showing that the trust controlled the earnings of income from Harold's insurance business. The preprinted "employment agreement" upon which they rely provides in general terms that the executive trustee's (Harold's) duties were to "Manage the day to day business affairs to THIS TRUST to the best of * * * [his] management ability being guided by The Trustees and the Minutes of THIS TRUST." We do not think that this nebulous agreement between Harold on one side and Harold, his wife, and loyal employee on the other side as purported trustees can possibly be construed to confer upon the trust the requisite control over the earnings of the income--control of the amount of Harold's time devoted to selling insurance, the effectiveness of his sales efforts, or his disposition of his earnings. See ; , affg. a Memorandum Opinion of this *621 Court; , affg. . Even more fundamentally, the trust must be entirely disregarded because it was a sham, devoid of economic reality. It is not true, as a general ruke,-- that income from a trust legally created and administered may be lightly attributed to the settlor outside of the statutory provisions provided by Congress in sections 671 through 677. However, when the settlor is trustee and the beneficiaries are the settlor and his family, such trust arrangement must be closely scrutinized for economic substance. . [Fn. ref. omitted.] . Petitioners' trust lacked economic reality. First, there is no credible evidence that the erection of the trust altered in any respect the status quo. Harold controlled the running of his agency, which earned the income, both before and after creation of the trust. In the first 2 years in question, Harold and Mary constituted a majority of the trustees and as such controlled the trust's decisions. [4] Mary did *622 not testify and we have no evidence to suggest that she had any experience or interest in insurance matters or that she exercised any judgment independent of her husband's opinions in running his business. Although Harold resigned as trustee in 1977, we find it incredible that he actually ceded control of the business that generated his livelihood to his wife and an employee. [5] We are convinced that he continued to control the business, writing nearly all the checks and, we infer, making virtually all of the decisions just as before. Although Donna testified that she became more involved in the insurance business after she became a trustee and that she exercised her independent judgment as a trustee, she was not a credible witness. Donna was a friend of petitioners' *623 and was, moreover, Harold's employee, subject to being fired by him, and, if fired, she testified, "I'd have to resign as trustee, I imagine." We simply do not believe her testimony that the trust wrought any significant change in the running of the insurance company or petitioners' family affairs. [6]
Moreover, we note that the trustees disregarded the forms of the paper entity that Harold allegedly created. According to the bank resolution minutes, checks were to be signed by trustees; yet even after his resignation nearly all checks on both acounts were written and signed by Harold. [7] The trust was also used for petitioners' personal purposes--to send flowers, buy shoes and milk, to pay personal income *624 taxes. No credible evidence suggests that these payments were pro rata "emoluments" authorized and accounted for by the trust or reported on petitioners' individual tax returns. Petitioners emphasize that Donna also received personal benefits from the trust, and point to a schedule of her "fringe benefits" for 1977, 1978, and 1979. These benefits include the payment of such items as a carpet for her home, a television, home utilities, travel expenses, and her daughter's wedding pictures. The totals of these "fringe benefits", however, do not coincide with the amounts reported as distributions on the trust's fiduciary returns, and the clear inference is that all such "distributions" were, in fact, compensation for her services to the insurance agency. There is no evidence of record that the other beneficiary, Ronald, received any such benefits, or that the trustees were authorized to make non-pro rata distributions.Evidence that the *625 trustees disregarded the inhibitions of a trust arrangement hardly encourages us to respect it. As we stated in : [S]ince petitioners were free to deal with the trust property and, in fact, did deal with the trust property free from fiduciary restraints, as a matter of economic reality, there was no separation of legal title from beneficial enjoyment and, as such, this trust is a nullity under the tax laws. We find absolutely no substance to the trust arrangement, and, "[s]ince petitioners did not respect this trust as a separate entity, we can see no reason to do so, and we therefore sustain respondent's determination." . [8]
Petitioners *626 also argue that they are not liable for additions to tax for negligence or intentional disregard of the law within the meaning of section 6653(a). We disagree. "No reasonable person would have trusted this scheme to work." , affg. a Memorandum Opinion of this Court. We think it incredible that, as an insurance company representative, Harold believed that the simple expedient of filling in some preprinted trust forms could significantly reduce taxes. If he was not aware that signing the trust papers would not shield him from taxes, failure to question a competent lawyer or accountant about such a proposition before embarking on the course of action he pursued constitutes negligence. Further, Harold was personally alerted to the dubious standing of his trust when Dana White refused to prepare petitioners' tax return for 1977. Persistence after such a warning must, at a minimum, qualify as negligence or intentional disregard of the law. See ; secs. 6653(b), 6673, 7201, and 7206(1). To reflect the foregoing, Decision will be entered for the *627 respondent.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as in effect during the tax years in issue, unless otherwise noted. ↩
2. Petitioners apparently have conceded that an addition to tax for the delinquent filing of their return for 1978 is proper, and the parties have stipulated to its maximum amount.↩
3. The fiduciary returns for 1977 and 1978, as well as petitioners' individual return for 1978, were prepared by Darlene Swayze. Cf. , in which we held invalid for tax purposes a family trust created by Darlene Swayze and her husband. We also note that petitioner admitted knowing a State Farm agent named Joe (Jerome) Hanson; see , affg. per curiam a Memorandum Opinion of this Court.↩
4. Cf. secs. 674(a) and 677. Clearly, Mary's one-day assignment of property to Harold must be disregarded so that she is a co-grantor of the trust. , affg. a Memorandum Opinion of this Court. ↩
5. See , affd. sub nom .↩
6. Donna's loyalty to petitioners is evident in her testifying that the checks written for petitioners' personal purposes were either consultant fees or beneficial distributions that "were charged as income against Harold, and he paid taxes on it at the end of the tax year." On cross-examination, Donna admitted that she did not know that petitioners in fact reported these items as income on their tax returns and that she had indeed never seen petitioners' income tax returns.↩
7. Although Donna testified that she and Mary gave their permission for this arrangement, we have no evidence supporting this statement--the bank resolution has not been amended, nor is there a minute showing the granting of such permission.↩
8. Harold stated that he set up the trust in order to avoid probate. We find this assertion of little weight. When asked how the trust would have helped achieve this alleged goal, Harold replied: "I didn't go into it that much." Moreover, even if this probate avoidance motivation existed, it is irrelevant for our purposes, since the trust clearly effected no economic change and was a mere sham under the tax laws.↩